BARRETT, (MORRIS v.) See Case No. 9,827.

BARRETT, (POPE v.) See Case No. 11,273.

BARRETT, (STEARNS v.) See Case No. 13,337.

## Case No. 1,050.

### BARRETT et al. v. The WACOUSTA.

[1 Flip. 517;[1] 8 Chi. Leg. News, 194; 1 Cin. Law Bul. 44.]

District Court, N. D. Ohio Term. March 4, 1876.

WHAT ARE "GOING RATES."

1. Rate means price, value. Going rate as to freight, like market price for produce, means a fixed and established price. A rate for freight cannot be established by a mere offer of a shipper or demand of a carrier. It can only be done by an actual contract made in port, and the last one so made for the same port would fix the rate.

[See A Cargo of Malt, 10 Fed. 774.]

2. If on a given day the price varied, rose, lowered and rose again during the day the average for the day should be regarded as the going rate. But if no contracts had been made on that day, then the rate of the preceding day would continue until an actual shipping contract should be made at a different rate.

[In admiralty. Libel in rem by C. S. Barrett et al. against the schooner Wacousta for alleged breach of a charter party. Decree for libellants.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

Mix, Noble & White, for libellant.

H. D. Goulden, for defendant.

WELKER, District Judge. The libellants on the 15th of November, 1873, entered into a charter party with the defendant, whereby it was agreed that said schooner should carry a cargo for the libellants from the port of Cleveland to the port of Toronto, Canada, for two dollars and twenty-five cents in gold per ton, or the going rates, at the time the schooner should report for loading. The capacity of the vessel was four hundred tons. The vessel, through the master, reported for load on the 20th of November, 1873, to the libellants, and the master then claimed that $2.50 in gold per ton was the going rate, which was denied by the libellants; they asserting that $2.25 was then the going rate, and refused to agree to pay more. Thereupon the master refused to load the coal, which was then ready to be loaded, or take it upon the vessel, and the vessel did not carry the coal for the libellants; and they, after the refusal, contracted with the schooner Moss to carry the coal to Toronto at the rate of $2.50 in gold per ton, which difference in price they seek to recover in this suit. The contract was proven to be as above stated.

There was a good deal of evidence given on both sides to ascertain and settle what was the "going rate" at this port for the port of Toronto on the 20th and at the time the defendant reported, the libellants claiming it was $2.25, and the defendant it was $2.50. Several experts were examined and much difference of opinion was manifested as to how "going rates" were established and ascertained; some claiming that the prices fixed in the last charter party made at the port of Toronto determined the rate, and others, that whatever might be offered vessel owners by shippers made the "going rate." The testimony showed that in the forenoon of the 20th, and up to the time the defendant reported for load, the last contract for shipment for Toronto made between shipper and carrier was $2.25 in gold per ton. That before the master reported for load, he had been offered by Mr. Crawford $2.50 in gold per ton, and that when he reported to libellants, he informed them of the offer and proposed to carry for them at the same rate, which they refused, and said they would rely on their contract. Afterwards, on the same day, the master made a contract with Crawford at the rate of $2.50 in gold, which was the first contract for that price made on that date, and was followed by the one made by the libellants with the schooner Moss, at $2.50.

The question to settle is: What was the "going rate" at the time the defendant reported to take load? If $2.25, then the libellants are entitled to recover; if $2.50, then they must fail in their suit. It will be necessary, before determining the question, to understand what is meant by "going rate,"

and how it is established or ascertained in the port. Rate means price, value. "Going rate" as to freight, like "market price" for produce means a fixed and established price for the time. To make a market price there must be buying and selling, purchase and sale. The price of gold on 'change is fixed by sales made. A price cannot be established by a mere offer to sell, or an offer to purchase. Sales must be consummated by agreement to make a market price. The minds of the buyer and seller must unite on a price. So of a rate for freight. It cannot be established by a mere offer of a shipper or demand of a carrier. It can only be done by an actual contract having been made in the port, and the last one so made for the same port, would fix the rate. If, however, on a given day the price has varied, being raised, lowered, and raised during the day, the rate for the day would be an average of the rate, which should be regarded as the "going rate" for that day. If, on a given day, no contracts for shipments had been made, then those of a preceding day would constitute the "going rate" for that day, and would continue until changed by an actual shipping contract made at a different rate. If mere offers by shippers, or demand of carriers, could establish the rate, then there would be no certainty in the fulfillment of that large class of contracts made for freight at "going rates;" shippers would have it in their power to reduce freights at their pleasure, and carriers could increase them as might best subserve their interests.

The only safe, and the true rule is: that rates of freight are fixed and established by actual contracts in the market, and can only be changed by contract in good faith, made in the port for like services. The evidence in this case shows very satisfactorily that no contract had been made in this port before the refusal of the defendant to carry the coal for libellant for any higher price than $2.25 in gold, and that the defendant in fact, made the first contract after such refusal at the new rate of $2.50 per ton. This contract then changed the rate to $2.50, and the libellants had to conform to such increase in their contract with the Moss. The defendant, therefore, in refusing to carry the coal for the libellants at $2.25 in gold, per ton, as the contract bound the defendant to do, violated the contract of shipment, and for which the libellants are entitled to recover.

Another question is made on the hearing, which is not distinctly made in the answer of the defendant, and which it is claimed, prevents the libellants from a recovery in the case. The evidence shows that the libellants had sold the coal, to be carried on the vessel to a firm at Toronto by the name of Conger & Co., the freight to be paid by the consignees on its receipt. It also shows that the contract with Conger & Co. was that they should receive the coal chargeable with a

freight of only $2.25 in gold per ton. It is also shown that the consignees paid the $2.50 in gold per ton freight for the coal shipped on the Moss on its receipt—that afterwards, and after this suit was commenced, the libellants settled with Conger & Co., and paid them the difference in the freight so paid by the consignees. On this state of facts, it is claimed the libellants had no right in these proceedings against the defendant, having no interest in the contract and sustaining no damages.

The answer to this claim is, that by this contract the coal sold only being chargeable with $2.25 per ton, to be paid by the consignees, any excess paid over that sum was necessarily a loss to that extent on the value of the libellants' coal and the price they were to pay for it, and therefore a damage to them in the amount their consignees were then compelled to pay.

Decree for libellants for $123.91..